The Chancellor.
The gravamen of the bill is, that the assignment by James Abbott to the defendant of the bond and mortgage of John G. Baker was without consideration, and intended as a power of attorney only, in order to authorize the defendant to collect the money due on the bond.
Considerable evidence was taken to show the imbecility of the old man; and, upon the argument, the defendant’s counsel endeavored to establish, from this evidence, that James Abbott, at the time he made the assignment, wras so infirm in body and mind as to render him incompetent in law to dispose of his property. But this case cannot he determined upon the question of James Abbott’s legal competency to transact business. The evidence, so far as it has been introduced for such purpose, is irrelevant. No such issue has been made by the pleadings, and of course none such is before the court for its determination. The bill does indeed allege, that James Abbott was an old man, being at the time of the assignment about eighty-six years of age, very infirm, and unable to transact busi *248 ness. But it does not allege this as a reason for disaffirming the contract; on the contrary, it is stated as the reasonable inducement which prompted him to constitute the defendant his agent, with authority to enforce the payment of the obligation.
The only question, therefore, for the decision of the court is, whether the assignment conveyed to the defendant, as the absolute owner, the interest of the obligee in the bond, or was intended by the parties as a mere authority and power to collect the money due upon it ? The defendant is called upon to disclose the character of the transaction and the consideration which .passed from him to James Abbott for the assignment.
The defendant, by his answer, denies that the assignment was without consideration, or made to him as the mere agent of James Abbott to collect the money due upon the bond, or in any other way or for any other purpose than as an absolute and full assignment for the defendant’s own use and benefit. He admits that no consideration was given by him at the time, but avers the true consideration to have been, a mere parol agreement on his part to provide for James Abbott during his lifetime, to pay such debts and liabilities as were then outstanding against him, and to discharge the expenses of his burial. He avers that he has paid the consideration; that from the time of the assignment up to the time of the death of Abbott, he provided for him suitable and sufficient board, clothing, and other necessaries and comforts of life, and paid off and discharged sundry debts and liabilities, and also paid the expenses of his burial, and that he has fully discharged the consideration, as he agreed and assumed.
The first question is, how far is this answer evidence for the defendant ? The general rule is, that the answer of a defendant, so far as it is responsive to the bill, is evidence for the party. This is the rule, as broadly stated, but it has its limits and its exceptions. It is no evidence *249 where it asserts a right affirmatively in opposition to the complainant’s demands. In this case, the defendant is called upon to disclose what consideration he paid for the assignment. If his answer had been, that he paid the amount of the principal and interest due on the bond at the time of the assignment, his answer would be evidence of the fact, and the court would not put him to the proof. But he answers, he paid no consideration at the time, but merely promised that he would make certain payments and perform certain duties at a future time. Ilis allegation, that he has performed his promise, cannot avail him. He is bound to establish the fact by proof. In Thomson v. Lambe, 7 Ves. 587, Lord Eldon says, “ he was clearly of opinion, a person charged by his answer cannot, by his answer, discharge himself, not even by his examination, (before the master) unless it is in this way: if the answer or examination states that, upon a particular day, he received a sum of money, and paid it over, that may discharge him ; but if he says, that upon a particular day he received a sum of money, and upon a subsequent day he paid it over, that cannot be used in his discharge, for it is a different transaction.” In Hutchinson v. Tindall, 2 Green’s C. R. 357, and in Hart v. Ten Eyck, 2 J. C. R. 62, and in a note to the last case, 91, the numerous authorities upon this subject will be found collected and commented upon. I think the current of these authorities will be found to accord with the views I have expressed in regard to the answer in the present case.
Let us examine, then, the case upon the evidence. The defendant has, in the first place, endeavored to prove the agreement between Abbott and himself, as to the assignment. Two witnesses were present, as he alleges, at the time it was made, Prudence DeHart, a daughter of Abbott, and who is the subscribing witness to the assignment, and the defendant’s mother, also a daughter of Abbott.
Prudence DeHart testifies she subscribed the assignment *250 as' a witness. She does not recollect hearing her father say, at the time of the assignment, what the defendant was to do, or give for the bond. Her father told her that Samuel would pay his board, and that whatever he broke' or destroyed while there Samuel would pay for it. This witness certainly fails to prove the agreement alleged in the answer. His telling her that Samuel would pay his board, &c., is quite as consistent, and indeed more so, with the allegation of the bill, that the bond was assigned merely to enable the defendant to collect the money to make the payment, as with the allegation of the answer, that such payment was a part consideration for the absolute assignment of the bond. It certainly is very strange that James Abbott’s daughter should have been the subscribing witness to the instrument by which her father conveyed away all the property he had in the world, and that a bond and mortgage of $3000, and yet, that this daughter should not know, if it was meant as an absolute transfer of his property, what consideration he received for it. She says she did not hear all the conversation; but this does not account for the strange fact, that this bond should be assigned under the circumstances, and that she should have witnessed the assignment, and not have understood from the parties what the consideration was, and particularly, as there is no pretence that the transaction was a secret one, nor any disposition in either of the parties to conceal its true character from the witness. It is quite as strange that James Abbott should have continued to live with this daughter for more than a year after this, and that she should never have heard from her father upon what terms he had disposed of his property. The witness, however, says, that she did hear her father say often that he had no property, for he had assigned it all to Samuel Porch. I do not mean to intimate that this witness has concealed anything in her testimony. She was called as a witness for the defendant against her own interest. If this assignment should be declared not to be *251 an absolute assignment, she takes under the will of her father an equal share with other legatees named in the will of the money due upon the bond in dispute.
Edith DeHart, the mother of defendant, is the other witness alleged to have been present at the time of the assignment. She testifies that she went with her son to see her father, then living with his daughter, Prudence DeHart; that she then had in her possession the bond in question, and took it with her—the bond had been in her possession for three months previous; that her father sold the bond to Samuel Porch, the defendant, who was to pay his expenses while he lived, his funeral expenses when he died, and a bill of Doctor Pisler’s; she did not recollect hearing anything said about any other debts. The , witness further testifies to hearing the old man say often to the defendant, in speaking of the assignment, “ Son, I don’t want it, hut don’t let Baker cheat you out of it.” It is proper to remark, in reference to this witness, in addition to the fact of her being the mother of the defendant, she is cut off with a legacy of ten dollars by the will which disposes of this bond, if the assignment is-set aside.
In addition to this evidence, the defendant endeavors to show that the assignment was absolute by corroborating circumstances, and also to prove that he discharged the duties which constituted the consideration of the assignment.
I think the evidence is sufficient to show that the defendant did pay the then existing debts of James Abbott, supported him comfortably while he lived, and gave him a decent burial. But the fact that he did this is, standing by itself, as consistent with the fact of a qualified, as of an absolute assignment. If the assignment, by the intention of the parties, was a mere power of attorney, the defendant by it having the control of all the property, and being James Abbott’s grandson, it was a reasonable expectation that the defendant, having funds, or abundant security in his hands, would not permit his grandfather to *252 suffer from want, but would discharge the debts of a few dollars, and provide a comfortable living for the old man.
There are some circumstances corroborative of the defendant’s case, and which, in connection with the evidence already alluded to, are sufficient to entitle him to the benefit of the defence set up in his answer, unless it is impeached by the complainant.
In September, 1849, James Abbott, while the bond and mortgage were in his possession, made his will disposing of all his property, which consisted of this bond and mortgage only. The will was in the possession of John Harding, who was the executor named in it. In April, 1851, nearly ten months after the assignment, James Abbott drew an order upon Harding, requesting him to deliver the will to the bearer of the order’, and stating in the, order, that he had made some other alteration, and did not wish that will to have any effect. It does not appear that the defendant had anything to do with procuring that order, or indeed, that he had any knowledge of it. This order was taken to Harding, but he refused to give up the will. He said that he understood there was some difficulty in the family, and that he would rather not give up the will. Jacob DeHart says he drew the order at the request of Abbott, who at the time said, he wished the will taken up; that he had signed away his property. When the witness told him that Harding refused to comply with the order, he said, he ought to have given it up; but that it did not make much odds, he could make another, but he had nothing to will.
Prudence DeHart says, when she came home after Harding had refused to give up the will, James Abbott said, it would make no difference; that he had no property, for he had assigned it all to Samuel Porch; and she heard him say that often.
Edith DeHart says, “ I have heard him say that he did not want any will; that he had got rid of his property, and had nothing to leave.”
*253 There was no effort made in cross-examining the witnesses, or by the introduction of any other evidence, to cast discredit upon this order, or to weaken the natural force and effect it is calculated to produce. It would have been more satisfactory if the witnesses had been questioned in reference to this order. The course of the cross-examination leads me to suppose that the defendant’s counsel were not disposed to question the accuracy of the witnesses in reference to this transaction, or the color they gave to this feature of the case.
The complainant, to sustain the case made by the bill, relies—
First. Upon the improbability that James Abbott should have made the assignment, as an absolute one, upon the consideration alleged by the defendant. That an old man, eighty-six years of age, having all his property in a bond and mortgage of three thousand dollars; having no home, but boarding around among his children; having several sons and several daughters, from whom his affections were in no manner alienated, should have given away all his property to a grandson upon a naked promise that he would maintain him while living, and provide for him a decent burial; that he should not have taken any evidence of the agreement, and should have made it without consultation with any of his children or any friend, can scarcely be accounted for, except as an improvident bargain of an imbecile, childish old man. If James Abbott himself had filed this bill, the court, upon the evidence, would not have listened a moment to the defendant’s allegation, that the assignment was an absolute one. The case is altered by the fact, that the agreement is executed; that the parties lived under the agreement for more than a year; that as far as the evidence goes, James Abbott remained satisfied with it, and never endeavored to recall or gainsay it; and that he was furnished a decent burial under its provisions. The fact, that the complainant is asserting rights, as the representative of James Abbott, *254 under an instrument which in his lifetime he repudiated when it came in conflict with the assignment, is entitled to much consideration.
Again. The complainant endeavors to rebut the evidence upon which the defendant relies, by showing the declarations of the defendant to different individuals, and on various occasions, to have been inconsistent with the claim he now makes to the bond and mortgage.
Richard II Tice testifies he had a conversation with the defendant, when the witness told him that it was a shame the matter in reference to the judgment, which had been obtained upon this bond against Baker, could not be settled between them; the defendant said, he had no right to offset Baker’s bill; that he was authorized to collect the money, but to pay nothing out of it. He said, if the old man was willing, he had no objections. The witness observed to defendant, that if he had a power of attorney that would authorize him to settle. Defendant replied that he had nothing more to do with it, except to collect the money; and that when the money was collected, he was bound to pay it over to the old man. The witness says this conversation took place in William Tweed’s store, and that Mr. Tweed took part in it. He mentions the names of four individuals as present besides defendant and himself. Three of them, including Mr. Tweed, were called by defendant. They deny ever having heard any such conversation as that detailed by the witness. Thomas Willetts, one of the persons named as having been present, says he has no recollection of any such conversation ; he says, if he had been present and heard any such conversation, he thinks he should have recollected something about it. The force of Tice’s testimony is certainly very much weakened by the fact, that the witnesses whom he appeals to for corroboration do not sustain him.
Jacob Davis says, that in a conversation with him, he told defendant he, witness, understood he owned the bond; he replied, he did not. He said he had a power of attor *255 ney from his grandfather to collect it, and that he could not let him up. He said distinctly, he did not own the bond, but he said nothing further in explanation than that he had a power of attorney from his grandfather to collect it. Ho one but defendant and witness were present at this conversation; it took place some three years before the evidence was given. "Witness never repeated the conversation to any one before giving his evidence. When I remark, that at the very time this conversation is alleged to have occurred, there was a contest going on in reference to the bond, and that the defendant was then actually claiming it as his own, it is a reasonable conclusion that the witness misapprehended the defendant; and as the witness gives only the impression made upon him, which was three years previous, we may withhold any reliance upon his testimony without at all impeaching his integrity.
The only other witness upon whom the defendant relies is John G. Baker. John Gr. Baker testifies to a conversation between himself and defendant, when the defendant made declarations in reference to the bond inconsistent with his being the absolute owner of it. But Mr. Baker does not occupy a position to entitle him to the credit of a disinterested witness; and I think a remark like this may be made of witness without casting any shade upon his character. Where he is interested in the event of a suit, though an interest which does not exclude him as a witness, yet where he entertains inimical feelings of long standing towards the party against whom he is called, where there is a feeling existing between them relating to the very matter in controversy, and where the witness is taking an active part in the suit, such a witness, no matter how exalted his character, is not entitled to the credit of a disinterested witness. He sees things and judges of things through a distorted medium, and it is natural that false impressions should be made upon his mind, which do not bear any more resemblance to the truth, but are *256 rather deepened with their original coloring after years have passed away and the cause of controversy still existing. Mr. Baker’s position is a peculiar one. There is an angry contest existing between him and the defendant in reference to the bond, the subject of this suit. The defendant has a judgment against him and a levy upon his property: the witness claims that he has an account against James Abbott, which ought’ to be allowed him, and deducted from this judgment; the defendant refuses to allow it. The witness procured Joseph Fisler, the complainant, to take out letters of administration for the very purpose of instituting this suit and settling the account which the witness has against the estate: the witness’ son married the complainant’s daughter.
I have thus adverted to all the material evidence bearing upon the issue in this case, and I am in doubt where the truth of the case lies; I am in doubt as to whether the assignment was intended as an absolute one, or as a mere authority to enable the defendant to collect the money. Here is a doubtful matter of fact, one peculiarly fitted for a jury to try. It is the right of the court to direct an issue in such a case, and I feel it is my duty to do so in this.